IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHAOJIE CHEN,<br>     a/k/a "Chao Jie Chen,"<br>     a/k/a "Cao Jie Chen,"<br>     a/k/a "Jay,"<br>     a/k/a "Jie"<br>     a/k/a "Jimmy,"<br>     a/k/a "Tim,"<br>     a/k/a "Justin,"<br>     a/k/a "Kelvin,"<br><br>          *Defendant*. | Case No. 1:24-MJ-153<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Peter W. Maher, a Special Agent with the United States Drug Enforcement Administration ("DEA"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      This Affidavit is submitted in support of a criminal complaint for **CHAOJIE CHEN a/k/a "Chao Jie Chen" a/k/a "Cao Jie Chen" a/k/a "Jay" a/k/a "Jie" a/k/a "Jimmy" a/k/a "Tim" a/k/a "Justin" a/k/a "Kelvin" ("CHEN")**. Based on the information set forth in this Affidavit, I submit there is probable cause to believe that from at least in or around April 2019 to the present, in the Eastern District of Virginia and elsewhere, **CHEN** conspired with others known and unknown to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h) (Conspiracy to Launder Monetary Instruments), 1956(a)(1)(B)(i) (Concealment Money Laundering), and 1956(a)(3)(B) (Sting Money Laundering).

2.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I have been employed as a Special Agent with DEA since approximately April 2016. I am currently assigned to the Special Operations Division ("SOD") – Bilateral Investigations Unit, a group tasked with investigating the world's most substantial drug traffickers, money launderers, arms smugglers, and narco-terrorists.

3.      Prior to being assigned to SOD, I was assigned to the High Intensity Drug Trafficking Area group of DEA's Memphis, Tennessee, Resident Office. As a DEA Special Agent, I have conducted numerous investigations targeting high-level foreign drug traffickers throughout the world, including corrupt foreign government officials. For the last seven years, I also have conducted a series of global money laundering investigations focused on the laundering of proceeds derived from illicit drug sales through China, Hong Kong, and other locations throughout the Far East.

4.      Before my employment with DEA, I was a Police Officer with the City of Tulsa, Oklahoma, Police Department for approximately three years. Throughout my career with the Tulsa Police Department, I was assigned to each of the city's three patrol divisions. I also served as an undercover and plainclothes police officer investigating street-level narcotics and human trafficking operations, in addition to other crimes.

5.      During my employment with DEA, I have conducted and supervised numerous investigations involving unlawful importation, exportation, manufacture, possession with intent to distribute, and distribution of narcotics; the laundering of narcotics proceeds and monetary instruments derived from narcotics activities; and conspiracies associated with narcotics and money laundering offenses. These investigations have involved debriefings of defendants, witnesses, and informants; conducting surveillance; executing search warrants; seizing narcotics

and narcotics-related assets; reviewing and analyzing records related to drug trafficking and money laundering; reviewing electronically intercepted conversations; reviewing computerized data and stored electronic communications; and making arrests.

6.     Throughout my career, I have become familiar with the methods employed by narcotics traffickers to smuggle, safeguard, and distribute narcotics, commit extortion and other violent crimes, and to collect and launder proceeds of drug trafficking. I have become familiar with the general modes and operations of criminals undertaking these activities and with the investigative techniques that are useful and effective in investigating organizations involved in drug trafficking and money laundering activities. I also have consulted with other investigators who have extensive training and experience in conducting criminal enterprises and financial investigations that involve money laundering.

7.     Based on this and other investigations, coupled with information from other law enforcement agents, as well as my training and experience, I am aware that:

   a. international drug trafficking is fundamentally based upon logistics, whereby drug traffickers move drugs from areas of high supply and low resale value (such as South America) to areas of lower supply and higher resale value (such as the United States and Europe). Moving large quantities of drugs requires specialized logistics, such as air or marine conveyances, or the use of freight or containerized shipments. Once drugs are sold, traffickers need to move large amounts of drug proceeds back to the source countries;

   b. international drug trafficking is lucrative, and drug trafficking organizations ("DTOs") employ a myriad of methods to laundering the proceeds from the

sale of drugs. Due to the large quantities of cash that drug traffickers possess from drug transactions, drug traffickers commonly seek to conceal and launder the illicit proceeds of their activity through the use of both illegal and legal business enterprises and also rely upon complex money laundering networks to assist them in this task;

c.   trade-based money laundering is the process of disguising the proceeds of crime and moving value through the use of trade transactions in an attempt to legitimize their illicit origin. As with many money laundering schemes, the first step is to take illicit cash and place that cash in a financial institution. The subsequent purchasing of products allows money launderers to move illicit proceeds across borders without introducing the currency into the banking system in their home country. Trade based money laundering has several functions. First, it allows transnational criminal organizations to move illicit proceeds across international borders and conceal the origin of the illicit funds while minimizing the use of the banking system, thereby avoiding reporting requirements. Second, it also legitimizes the illicit funds in the country where the goods are received and subsequently sold;

d.   international drug trafficking generates large volumes of bulk cash in various foreign currencies which is difficult to convert and/or physically transport covertly. One of the primary methods that international drug traffickers use to convert and move the value of these foreign currencies back to a home or drug-source country is to use money brokers and/or money launderers. For a fee, these individuals specialize in picking up and

4

placing the bulk cash into the banking system in coordination with other individuals;

e. depending on the needs of their drug trafficking clients, these money brokers/launderers may sell all or part of the foreign currencies to individuals and businesses in need of these currencies to settle international trade debts or purchase assets and make investments in those currencies. In these instances, drug traffickers receive payment for their proceeds upon the pick-up of the bulk currency in the country where the drugs are sold. For the purposes of this investigation, this is the United States. The money brokers/launderers can also move the value of these drug proceeds through the international financial system at the direction of drug trafficking clients; and

f. large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. Even though these assets are in names other than the narcotics traffickers', the traffickers own and continue to use these assets and exercise dominion and control over them.

8. With respect to this investigation and others, I have learned the United States is one of the world's largest and most lucrative markets in which to distribute illegal drugs. The overwhelming majority of the illicit drugs consumed in the United States is produced abroad. The process of transporting drugs from abroad and importing them into the United States is complex

and generally involves numerous organizations and individuals. The price of drug continually increases along this supply chain, culminating at the point of sale to users in the United States.

9.    The illegal drug trade generates illicit profits in the United States in the form of U.S. dollars. For this criminal business to continue and achieve its purpose, it is necessary for a portion of this money to be repatriated to the DTOs that manufactured and distributed the narcotics and ultimately brought them into the United States. However, because this money is the proceeds of a "specified unlawful activity," special care and skill has to be taken to transact it to avoid detection by law enforcement.

10.    Simultaneously, there is a demand for U.S. dollars and merchandise around the world, including in the People's Republic of China. There is also a demand for Chinese currency, known as yuan or renminbi ("RMB"), among Latin American merchants, including those in Mexico, seeking to purchase Chinese goods to sell for profit. As a result, individuals with connections to "black market merchants" in China, and foreign, typically Mexican, DTOs and merchants are well-situated to profit by servicing these parallel demands. Most commonly, these Mexican DTOs include the Cartel Jalisco Nueva Generacion ("CJNG") and the Sinaloa Cartel.

11.    Individuals and organizations at the nexus of these needs meet them by receiving drug profits in the United States and: (1) transmitting them in a manner designed to cause an equivalent amount of foreign currency to arrive in bank accounts in China or (2) by using the cash to purchase U.S. goods that are subsequently shipped to China for re-sale. In either case, affirmation that the cash changed hands in the United States from "dealers" to "launderers" triggers the release of payment for the drugs in the location where they are required, often Mexico. For the purposes of this Affidavit, this exchange is known as a "mirror transfer." Once the proceeds are received in China, they are used to finance the purchase of Chinese goods. Merchants in Latin

American countries, including Mexico, seek the services of "brokers" capable of obtaining RMB to finance the purchase of Chinese merchandise. Once purchased, this merchandise is shipped to Latin American merchants, including those in Mexico, who sell it for profit through apparently legitimate businesses. The broker is thereby compensated for fronting the payment for the drugs to the drug trafficking organization. This cycle exists to the mutual benefit of all involved.

12.     The individuals responsible for arranging these transactions are compensated on the basis of their success in organizing and executing the transactions and the amount of money involved. It follows that these individuals, along with their co-conspirators, rely on and seek to further the continued success of the illegal drug trade in the United States.

13.     As set forth within this Affidavit, **CHEN** provided a critical and essential service to co-conspirators: he transported and coordinated the transport of narcotics proceeds generated by U.S. drug sales to co-conspirators who then laundered those proceeds to the next step in the money laundering process. Additionally, **CHEN** laundered proceeds himself for co-conspirators through a trade-based money laundering scheme.

14.     The defendant's role aided numerous members of this conspiracy and other money launderers spread throughout the globe. He conspired with individuals in the United States, China, and elsewhere, who conducted financial transactions with proceeds derived from the unlawful sale of controlled substances. The transactions were designed, at least in part, to conceal the nature, location, source, ownership, and control of the proceeds so that they could be provided to individuals and organizations responsible for trafficking illegal drugs into the United States. The conspirators' ultimate goal was to enrich themselves to the greatest extent possible by conducting these transactions.

15. As set forth in more detail below, the conspiracy included individuals in the United States, including **CHEN**, who obtained drug proceeds in the form of cash from representatives of drug traffickers. These individuals would confirm their authorization to collect the drug cash by presenting the drug traffickers' representatives with an agreed upon verification code, often a serial number taken from U.S. or foreign currency.

16. The conspiracy used other secretive and clandestine methods to accomplish its goals. For example:

    a. it was common for an individual involved in this conspiracy to transport drug proceeds across the United States so they could be further transacted by members of the conspiracy several states removed from where the proceeds were generated;

    b. the conspirators used encrypted communications platforms to discuss their illegal activities including, but not limited to, cellular telephone applications known as "WeChat" and "WhatsApp";

    c. the conspirators used bank accounts in the United States, China, and elsewhere to deposit and conduct financial transactions with drug proceeds, including those derived from the sale of cocaine and fentanyl; and

    d. the conspirators used foreign businesses as well personal and business financial accounts in the United States and abroad to launder and conceal the illicit drug proceeds they received.

17. The object of the conspiracy was to receive proceeds from the distribution of narcotics, conceal those proceeds from detection, and then launder the proceeds for DTOs. The defendant and others sought to facilitate the success of DTOs who imported and distributed drugs

in the United States. The conspirators did this by conducting financial transactions with the proceeds derived from the illegal sale of drugs. These transactions were designed, at least in part, to conceal the nature, location, source, ownership, and control of the proceeds. The defendant and other members of the conspiracy profited through commissions based on the amount of money involved in each financial transaction. These commissions came directly and indirectly from the DTOs with whom they conspired.

18.     Members of the conspiracy traveled to various locations throughout the United States, including the Eastern District of Virginia, to collect and cause the collection of proceeds derived from drug trafficking.

19.     Conspirators, both known and unknown, controlled or had access to accounts with Chinese financial institutions, including the Agricultural Bank of China and the Industrial and Commercial Bank of China. These accounts were used to receive and transact proceeds derived from drug sales in the United States.

20.     This Affidavit does not contain every fact known to me or the government regarding this investigation, but rather contains only information necessary to demonstrate probable cause in support of a criminal complaint and arrest warrant. All information contained in this Affidavit is either personally known to me, has been related to me by other law enforcement officers, or has been related to me by reports, records, and documents gathered during this investigation.

## RELEVANT STATUTES

21.     Under 18 U.S.C. § 1956(h), it is unlawful for any person to conspire to commit any offense defined in § 1956 or 1957. A violation of § 1956(h) is subject to the same penalties as the offense which was the object of the conspiracy.

22.     Under 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful for any person, knowing that the property involved in a financial transaction represents proceeds of some form of unlawful activity, to conduct, or attempt to conduct, such a financial transaction which in fact involves the proceeds of specified unlawful activity knowing that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

23.     Under 18 U.S.C. § 1956(a)(3)(B), it is unlawful for any person, with the intent to conceal or disguise the nature, location, source, ownership or control of property believed to be the proceeds of specified unlawful activity, to conduct, or attempt to conduct, a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity. The term "represented" means any representation made by a law enforcement officer or by another person at law enforcement's direction and with law enforcement's approval.

24.     Under 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(D), the manufacture, sale, or distribution of controlled substances constitute "specified unlawful activity" for purposes of § 1956.

## SUMMARY OF PROBABLE CAUSE

### *Background*

25.     Beginning in approximately January 2017, agents began investigating the leadership elements of Mexican DTOs and their money laundering networks. In addition to the seizure of over four (4) metric tons of cocaine in this investigation, the investigation has resulted in the conviction of multiple individuals for felony drug trafficking and/or money laundering offenses. Additionally, law enforcement has seized millions of dollars of drug proceeds nationwide.

26.     This investigation uncovered a money laundering organization ("MLO") led by individuals who laundered hundreds of millions of dollars for the CJNG and the Sinaloa Cartel, two of Mexico's dominant drug cartels. This MLO was responsible for laundering drug proceeds related to the importation of cocaine into the United States, primarily from Colombia and Guatemala via Mexico.

27.     Members of this MLO operate worldwide, including in China, Hong Kong, Macau, Colombia, Panama, Mexico, Guatemala, Belize, Australia, New Zealand, Malaysia, Costa Rica, Ecuador, Poland, the United States, and elsewhere. The money laundering scheme extends across multiple countries and continents and involves the laundering of drug proceeds in or through the United States, including in and through the Eastern District of Virginia.

28.     Multiple co-conspirators convicted as part of this investigation have cooperated with the government. Through debriefings, many of these individuals explained that the Interstate 95 corridor that passes through the Eastern District of Virginia up to New York is a key route in their money laundering operations, enabling them to transport both narcotics and narcotics proceeds to and from co-conspirators located in the Southeast United States to others in the Northeast.

*Identification of UCC-1*

29.     As part of this ongoing investigation, the government recruited a confidential source ("CS-1"). At law enforcement direction, CS-1 has represented him/herself to co-conspirators as a U.S.-based money launderer with significant connections to Mexican DTOs.[1]

---

[1] CS-1 was indicted, arrested, and pleaded guilty because of this investigation. CS-1 has cooperated extensively with the government. CS-1 was sentenced to 120 months in federal prison. As part of CS-1's guilty plea, CS-1 agreed to cooperate. The court ultimately reduced CS-1's sentence pursuant to a government motion under Fed. R. Crim. P. 35. CS-1's information has been corroborated by information provided by multiple additional cooperating defendants, bank records, naturalization documents, and electronic communications, among other means. CS-1 is a DEA confidential source and continues to cooperate with law enforcement in exchange for compensation and immigration benefits. Based on the foregoing, I submit that CS-1 is reliable.

30.     CS-1 identified an unindicted co-conspirator ("UCC-1") as a major international money launderer and drug trafficker based out of mainland China. Through a series of consensually monitored phone calls, text messages, and meetings, CS-1, at the direction of law enforcement, engaged in discussions with UCC-1 regarding potential laundering of drug proceeds in the United States. Further, at law enforcement direction, CS-1 has openly discussed drug trafficking with UCC-1, including distribution and importation of fentanyl and fentanyl precursors, cocaine, and heroin.[2]

*November 2023 Controlled Money Laundering Operation*

31.     On or about October 24, 2023, CS-1 spoke with UCC-1 via a recorded phone call and requested that UCC-1 send a courier to the Northern Virginia area to pick up proceeds from the sale of "merchandise." In my training and experience with investigation this organization, I know that "merchandise" is a code word for illicit narcotics. In my training and experience, drug traffickers commonly use such code words in hopes of avoiding detection by law enforcement and concealing their illicit activities.

32.     On or about October 30 and 31, 2023, CS-1 again spoke with UCC-1 via recorded phone calls in which UCC-1 informed CS-1 that UCC-1 could launder funds for approximately a 7% fee. UCC-1 further stated that UCC-1 would arrange for a courier to meet in Virginia to pick up the illicit proceeds so that UCC-1 could then launder the proceeds and return "clean" funds to CS-1 within approximately twenty-four (24) hours.

---

[2] The communications between UCC-1 and CS-1 were largely conducted in a Chinese dialect. Most calls were recorded and are being translated. The information contained in this Affidavit regarding the substance of these calls is based on either draft translations of the recorded calls and/or information provided by CS-1.

33.     On or about November 7, 2023, UCC-1 informed CS-1 in a recorded phone call that UCC-1 would provide CS-1 with the telephone number for UCC-1's U.S.-based money courier approximately two (2) to three (3) days prior to the money pick-up.

34.     On or about November 10, 2023, UCC-1 provided CS-1 with WhatsApp phone number 516-983-7489 ("x7489") as the contact number for UCC-1's money laundering dispatcher. UCC-1 also provided the serial number from a suspected U.S. currency note, which served as a passcode for the two parties exchanging the bulk U.S. currency in Arlington, Virginia. This is a common technique (often referred to as the currency verification technique) used by the members of this organization.

35.     Subsequent interception of Internet Protocol ("IP") data via a court-authorized WhatsApp pen register showed x7489 in the Chicago metropolitan area. Prior to providing CS-1 with this telephone number, UCC-1 exchanged multiple messages with Chicago-area telephone number (312) 731-2495 ("x2495"), a telephone number subsequently identified as being used by **CHEN** as described below in Paragraph 38. A subsequent query of x2495 through law enforcement databases revealed that it has been in repeated and frequent contact with UCC-1 and has also been documented in a separate but related federal investigation in Charlotte, North Carolina, involving large-scale money laundering operations.

36.     On or about November 15, 2023, in Arlington, Virginia, agents successfully introduced an undercover agent to UCC-1's money courier and delivered one hundred thousand dollars ($100,000.00) to the courier. Agents surveilled the courier, who drove back to Brooklyn, New York. UCC-1 subsequently had an equivalent amount, less UCC-1's commission, transmitted to a law enforcement-controlled cryptocurrency account.

*January 2024 Traffic Stop of* **CHEN**

37.    CS-1 continued communication with UCC-1 and arranged a second pickup of funds represented to be drug proceeds to occur on or about January 16, 2024. On or about January 10, 2024, UCC-1 provided CS-1 with a second Chicago-area telephone number, (312) 804-1309 ("x1309"), to arrange this pickup and provided the name **"Jay"** for the individual who would coordinate the pickup. Immediately surrounding and prior to UCC-1's communications with CS-1, UCC-1 communicated with x2495.

38.    On or about January 12, 2024, Honorable Judge Angela Petrone of the Circuit Court of Cook County, Illinois, signed an affidavit and application for historical cell tower information, prospective GPS location information, and the use of a cell site simulator on the x2495 telephone number. Following this, beginning on or about January 13, 2024, investigators began receiving location information on x2495, which revealed it was in/near the southside of Chicago.

39.    On or about January 15, 2024, agents observed that x2495 began to travel eastward from the Chicago metropolitan area. The device ultimately traveled to northern New Jersey (near the Staten Island, New York area), where it remained for approximately eight (8) to nine (9) hours. Following this, on or about January 16, 2024, the device began to travel westward, back toward the Chicago area.

40.    In an effort to identify the user of x2495, law enforcement coordinated with federal and state law enforcement partners in Ohio, including the Ohio State Highway Patrol ("OSHP"). OSHP troopers ultimately located a white Lexus SUV bearing Illinois license plates traveling westbound on the Ohio Turnpike. This vehicle was registered to **CHEN** at an address in Chicago.

41.    On or about January 16, 2024, OSHP troopers conducted a traffic stop on this vehicle for multiple traffic violations. Based on his State of Illinois Driver's License, the driver

14

and sole occupant of the vehicle was identified as **CHEN**. The troopers subsequently conducted an open-air sniff of the vehicle using a K-9, resulting in a positive alert to the trained odor of narcotics. As a result of the positive alert, OSHP troopers conducted a search of the vehicle. No contraband was located.

42.     During the traffic stop, which lasted approximately thirty (30) minutes, the location information of x2495 placed the device multiple times in the immediate vicinity of the traffic stop. Following the traffic stop, agents monitored the location information of x2495 and through physical and electronic surveillance followed **CHEN** as he returned to a residence in Chicago. Based on the foregoing, I submit there is probable cause to believe that **CHEN** was the user of x2495.

43.     UCC-1 later contacted CS-1 and informed CS-1 that UCC-1's U.S-based coordinator for the planned January 16, 2024, money pickup had been stopped by law enforcement. UCC-1 further stated that, at the time of the traffic stop, this individual had been returning from dropping off approximately $160,000 in bulk cash for UCC-1. UCC-1 stated that because this individual had been stopped after dropping off the cash, law enforcement did not locate any cash inside the individual's vehicle. Finally, UCC-1 stated that this individual was now concerned that law enforcement, specifically DEA, had arranged for the traffic stop in order to identify the driver of the vehicle so the driver could be arrested at a later date. Based on the foregoing, I believe there is probable cause to believe that UCC-1 was referring to **CHEN**.

44.     After identifying **CHEN**, investigators coordinated with law enforcement partners in the Detroit, Michigan, and Chicago, Illinois, areas and learned that **CHEN** had previously been encountered by law enforcement.

_April 2019 Seizure of $200,320 from **CHEN** in Detroit, Michigan_

45.     On or about April 3, 2019, troopers with the Michigan State Police conducted a traffic stop on a vehicle being driven by **CHEN**. During this traffic stop, just like the January 16, 2024, traffic stop, troopers deployed a K-9 unit which positively alerted to the trained odor of narcotics emanating from the vehicle. **CHEN** consented to the search of the vehicle and troopers discovered $200,320 concealed in several bags within a suitcase.

46.     Following the discovery of the bulk cash, **CHEN** waived his _Miranda_ rights and agreed to speak with investigators with the assistance of an interpreter. In this interview, **CHEN** denied ownership of the bulk cash discovered in his vehicle, stating that he had met with an unknown male in Detroit, Michigan, earlier that day who had given him the cash. When asked why this unknown male had handed him bulk cash, **CHEN** stated that his "friend" had asked him to pick up the cash and that it was for cellphones. **CHEN** did not know the name of his "friend" and stated that they communicated via the encrypted communication application, "WeChat," which has been used by numerous members of this organization to communicate regarding money laundering activities. Following this interview, **CHEN** was issued seizure paperwork for the currency and released.

_April 2020 Arrest of **CHEN** and Seizure of $149,680 in Chicago, Illinois_

47.     On or about April 27, 2020, investigators performed an investigative traffic stop on a vehicle in which **CHEN** was a passenger after observing **CHEN** meet in a parking lot with an individual who, as detailed below, later became a confidential source ("CS-3"). During the stop, investigators observed a gray bag on the floor behind the driver's seat. When asked about the bag, **CHEN** claimed ownership of the bag and stated that it contained "U.S. currency" for his family in China.

16

48.     During the traffic stop, investigators deployed a trained K-9 and, just like the April 2019 and January 2024 K-9 units, the K-9 unit alerted to the odor of narcotics from the vehicle. **CHEN** was then arrested and transported to the Chicago Police Department for an interview. A photograph of the funds seized during this traffic stop is depicted below:



*Photograph of Funds Seized from* **CHEN** *in April 2020*

49.     In a post-*Miranda* interview conducted with the assistance of an interpreter, **CHEN** stated that he worked for a Hong Kong-based company operated by an individual he identified as "Liu." According to **CHEN**, "Liu" paid him $7,000 per month to deliver electronic products to "customers" in the Chicago area in exchange for bulk cash. **CHEN** stated that after receiving the bulk cash from these "customers," he would then deliver the cash to various people at various addresses in the Chicago area, minus his monthly payment.

50.     Additionally, **CHEN** provided investigators with consent to search two (2) cellphones that were recovered during the traffic stop. Contained in one of these devices was a text message in which **CHEN** stated, "Please send your code." When asked about the message, **CHEN**

stated that, prior to conducting cash-for-electronics exchanges, "Liu" would send him a "code" which **CHEN** would then provide to the "customers" to confirm their identities. Further investigation revealed that these "codes" represent the serial numbers on U.S. currency notes which, as noted above, is a common tactic used by money laundering organizations.

51.     When asked by investigators if he responds to any nicknames or aliases, **CHEN** admitted that he answered to the nickname **"Jay,"** the same name provided by UCC-1 to CS-1 as UCC-1's U.S.-based coordinator for the planned January 2024 controlled money laundering operation.

52.     **CHEN** also provided investigators with consent to search several properties at which he resided. These searches discovered, among other things, ledgers, receipts, over two hundred fifty (250) Apple gift cards, vacuum seal bags, a vacuum sealer, a money counting machine, and rubber bands. All these items, in my training and experience, are indicia of illegal activity. Photographs of some of these items are depicted below:



*Rubber Bands, Vacuum Sealed Bags & Money Counting Machine in* **CHEN's** *Residence*



*Money Counting Machine Found in **CHEN's** Residence*



*Rubber Bands & Ledger Found in **CHEN's** Residence*

53.    Analysis of the ledgers discovered in **CHEN's** residence reflect money received by

**CHEN** and then apportioned out to various co-conspirators. Many of the recorded transactions

were catalogued by what appear to be U.S. currency serial numbers. Analysis of the transactions

is ongoing but thus far investigators have identified recorded transactions totaling at least $8,965,600 with each transaction corresponding to a specific date and U.S. currency serial number.

54.    Law enforcement analysis of the cellphones seized from **CHEN** on the day of his arrest also discovered communications and transactions that occurred in 2019 between **CHEN** and a co-conspirator charged and convicted as part of this investigation. This co-conspirator was convicted in the Eastern District of Virginia of money laundering for the same organization that this investigation has focused on and was sentenced to 60 months' custody.

55.    When asked about whether he believed his actions for "Liu" were illegal, **CHEN** stated that while he did not believe the activity was illegal, he began thinking there was something suspicious about the activity after his April 2019 encounter with law enforcement. Following this interview, **CHEN** was released.

*Connection to Specified Unlawful Activity*

56.    Under 18 U.S.C. § 1956(a)(1)(B)(i), for **CHEN's** activities described herein to be illegal, they must have been "designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of proceeds of specified unlawful activity[.]" Under 18 U.S.C. §§ 1956(c)(7) and 1961(1)(D), drug trafficking is one such specified unlawful activity.

57.    In addition to **CHEN's** connections to UCC-1's money laundering network, which is responsible for knowingly transacting in what has been represented by law enforcement sources to be drug trafficking proceeds, I submit there is probable cause to believe that the funds seized from **CHEN** in April 2019 and April 2020 were also proceeds of specified unlawful activity, that is, drug trafficking.

20

58.     On or about May 18, 2020, investigators met with CS-3 who, at that time, was a U.S.-based member of a Mexican DTO. CS-3 stated that he/she was responsible for delivering bulk quantities of narcotics proceeds generated by the sale of cocaine in the United States to various individuals who would then repatriate the proceeds to the Mexican DTO. Following this meeting, CS-3 became a confidential source.[3] As part of CS-3's role within the DTO, he/she stated that he/she began receiving instructions from the DTO to deliver bulk narcotics proceeds to individuals in the Chicago area.

59.     CS-3 explained that on or about April 27, 2020, he/she delivered bulk narcotics proceeds to an Asian male in Chicago. When shown a photograph of **CHEN**, CS-3 stated that **CHEN** "strongly resembled" the individual that he/she dropped off proceeds to on or about April 27, 2020, in Chicago. Based on the seizure of narcotics proceeds from **CHEN** on that date and law enforcement surveillance of CS-3 on that date, I submit there is probable cause to believe that **CHEN** was the individual that CS-3 delivered proceeds to on that date. CS-3 further stated that April 27, 2020, was the third time he/she had delivered bulk cash to this individual.

60.     In addition to CS-3's statements, probable cause that the funds seized from **CHEN** were derived from drug trafficking is supported by the fact that each time **CHEN** has been encountered by law enforcement, a K-9 unit has been deployed and positively alerted to the trained odor of narcotics emanating from vehicles in which **CHEN** was either driving or a passenger. Additionally, based on his own admissions and evidence obtained from both ledgers seized from his residences and electronic evidence found within his devices, **CHEN** and his co-conspirators

---

[3] CS-3's criminal record includes a 1987 conviction for assault and battery for which CS-3 was sentenced to 1-year supervision. CS-3's cooperation with law enforcement began in or about May 2020 and continued to September 2023. CS-3 was financially compensated for the information he/she provided. CS-3's information led to numerous seizures of narcotics and narcotics proceeds. CS-3's information has never been found to be false or misleading. For these reasons, I submit that CS-3 is deemed reliable.

used U.S. currency serial numbers to confirm their identities, a tactic that in my training and experience is indicative of illegal activity. Further, in my training and experience, the types of evidence discovered in the consensual searches of **CHEN's** residences, such as rubber bands, vacuum sealers, money counters, and ledgers, is also indicative of illegal activity. Finally, I also note that even though approximately $350,000 has been seized from **CHEN**, he has never made a claim for any of the funds to be returned to him as lawful money.

## <u>CONCLUSION</u>

61.     Based on the foregoing, I submit that probable cause exists to believe that from at least in or around April 2019 to the present, in the Eastern District of Virginia and elsewhere, **CHEN** conspired with others known and unknown to launder monetary instruments, in violation of 18 U.S.C. §§ 1956(h) (Conspiracy to Launder Monetary Instruments), 1956(a)(1)(B)(i) (Concealment Money Laundering), and 1956(a)(3)(B) (Sting Money Laundering).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Peter W. Maher*
Peter W. Maher
Special Agent
Drug Enforcement Administration

Subscribed and sworn to by telephone in accordance with Fed. R. Crim. Proc. 4.1 on April 16, 2024.

Hon. William B. Porter
United States Magistrate Judge